IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

**Carleen Jenkins, Shelia Vaughn, Cindy Shaffer, Kimberly Cox, Karis Myer, and Leigh Jacobs**

Plaintiffs,

vs.

**CACI, Inc. - Federal**

Defendant.

Case No. CIV-21-0501-F

## AMENDED COMPLAINT

COMES NOW Carleen Jenkins (individually known as Jenkins), Shelia Vaughn (individually known as Vaughn), Cindy Shaffer (individually known as Shaffer), Kimberly Cox (individually known as Cox), Karis Myer (individually known as Myer), and Leigh Jacobs (individually known as Jacobs) (collectively known as Plaintiffs) by and through their attorney of record, Jacque Pearsall, The Pearsall Group LLC, OBA # 18317 for their Complaint against Defendant, CACI, Inc. – Federal. The parties have agreed to substitute as the only party Defendant CACI, Inc. – Federal for the originally named Defendant CACI International Inc. Counsel for the Defendant represents to this Court that CACI, Inc. – Federal was the Plaintiffs' employer, agrees to waive service, and stipulates to not assert any failure to exhaust administrative remedies based on failure to name CACI, Inc. – Federal in the Plaintiffs' original charges. Plaintiffs for their causes of action against the Defendant allege and state as follows:

## NATURE OF ACTION

1. This jury action seeks redress for Defendant's violation of the laws of the United States in connection with the Plaintiffs Jenkins, Vaughn, Cox, Myer, and Jacobs, the Defendant terminated their employment in June 2020. Shaffer's employment was terminated in March of 2020. This action seeks to enforce rights pursuant to Title VII of the Civil Rights Acts of 1964 ("Title VII"), 42 U.S.C. § 2000e, et. seq., the Oklahoma Anti-Discrimination Act ("OADA") 25 O.S. § 1101 et. seq. prohibiting discrimination in employment based upon sex, the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 et. seq., and the Oklahoma Minimum Wage Act, 40 Okla. Stat. § 197.1 et. seq. and for retaliation for complaints made for violations of those acts. As redress for Defendant's violations, Plaintiffs prays for and demands, declaratory, equitable and legal relief, including compensatory damages, liquidated damages. punitive damages and attorney's fees and costs in an amount to be established at the trial of these causes.

## PARTIES

2. At all times material to this action, Plaintiffs, Carleen Jenkins, is a female resident of Oklahoma County, State of Oklahoma.

3. At all times material to this action, Plaintiffs, Shelia Vaughn, is a female resident of Oklahoma County, State of Oklahoma.

4. At all times material to this action, Plaintiffs, Cindy Shaffer, is a female resident of Canadian County, State of Oklahoma.

5. At all times material to this action, Plaintiffs, Kimberly Coxy, is a female resident of Oklahoma County, State of Oklahoma.

6. At all times material to this action, Plaintiffs, Karis Myer, is a female resident of Oklahoma County, State of Oklahoma.

7. At all times material to this action, Plaintiffs, Leigh Jacobs, is a male resident of Oklahoma County, State of Oklahoma.

8. At all times material to this action, Defendant employed the Plaintiffs and was conducting business at a location in Oklahoma County, State of Oklahoma.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiffs' claims brought under Federal law pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 2201.

10. Venue in this district is proper pursuant to 28 U.S.C. § 1391 (b) and (c), §1392 and 42 U.S.C. § 2000e-5(f)(3), because the employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Western District of Oklahoma.

11. All conditions precedent to Plaintiffs' entitlement to relief under this cause of action have been fulfilled and satisfied. While employed with Defendant, each Plaintiffs having filed a charge and affidavit of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued to each Plaintiff a Notice of Right to Sue on or about March 24, 2021. This suit is instituted within the 90-day requirement of the Notice of Right to Sue.

12. This Court has jurisdiction of Plaintiffs' claims brought under Oklahoma common law since all of Plaintiffs' claims arise from a common nucleus of operative

facts and are so intertwined as to make the Court's exercise of pendent jurisdiction over such claims reasonable and appropriate.

## BACKGROUND FACTS

13. The Defendant partners with the US government in providing advanced IT support for high-priority national security needs worldwide. Defendant's corporate headquarters is in Arlington, Virginia. However, after the summer of 2018, all onboarding processes for Defendant were managed out of the Oklahoma City offices. These processes included including recruiting, benefits, and payroll.

14. In the summer of 2018, Defendant opened its new Dr. J.P.(Jack) London Shared Services Center (SSC) in Oklahoma City, Oklahoma.

15. In a public announcement, Defendant stated it was "bringing centralized, state-of-the-art resources and expertise to Defendant's business operations. The SSC will optimize the delivery of cost-effective, high-quality support services with greater reliability and consistency across the company." The article further states, "The SSC is named for CACI's Executive Chairman and Chairman of the Board Dr. J.P. (Jack) London, as the founder of the modern-day CACI and an Oklahoma City Native." "The Center also expands the company's presence in the state, where CACI has business supporting the US Army, US Air Force, and Federal Aviation Administration."

16. Defendant hired the Plaintiffs in the summer of 2018 with the opening of Defendant's SSC. They worked as part of Defendant's Human Resources Department (HR) and were hired by Thomas Nesteruk, the head Executive Vice President of Shared Services, officing in OKC. Brian Jester soon replaced Nesteruk.

17. Plaintiffs Jenkins, Vaughn, Cox, Myer, and Jacobs were hired in HR Administration roles as non-exempt employees.

18. Shaffer was hired as an HR Administration Senior Manager for SSC, potentially making her an exempt employee. Shaffer was hired to direct and oversee the Human Resources service delivery activities for the Tier I Help Desk, Employee Services, New Hire Administration, Talent Acquisition, Compensation, Benefits, International and US immigration for the HR Shared Services organization which encompasses over 75 employees. None of the other Plaintiffs directly reported to Shaffer.

19. If Defendant can meet its burden of showing Shaffer was an exempt employee, Defendant engaged in conduct which would cause it to loss this exemption. Defendant's behavior prevented an otherwise exempt employee from receiving their predetermined salary when due on a guaranteed basis. This conduct makes the salary basis not free and clear and is an impermissible reduction in compensation, causing the loss of exempt status.

20. Unlike the news article which boosted the Oklahoma SSC provided "centralized, state-of-the-art resources and expertise," the SSC that the Plaintiffs found themselves in was a highly dysfunctional, chaotic environment with no processes in place and no assistance forthcoming from local management or corporate headquarters.

21. A few months after the Plaintiffs were hired, Jester replaced Thomas as the VP, Operations Shared Service Center in Oklahoma City.

22. Plaintiffs were told they could not work overtime. When Myer's timecard showed just a few minutes of overtime, she received a very stern email telling her she

needed to go into the systems and correct the time entered for the day to reflect that she had not worked any overtime.

23. However, the lack of processes and support meant the Plaintiffs' workload required them to work many hours over forty (40) in a workweek, overtime for which they were not compensated.

24. Plaintiffs spent many hours over forty (40) in a workweek building an employee process manual, fixing issues created by payroll mistakes, correcting onboarding errors, researching alternatives to failed procedures.

25. Plaintiffs were frequently criticized when they pointed out problems and defects in the Defendant's systems.

26. Once Jester was hired, he began to engage in sex discrimination through acts of harassment and retaliation against females, particularly females that did not exhibit the traditional stereotypical norms associated with females, such as being polite, accommodating, passive, cooperative, and emotional. When a female was strong, ambitious, demanding, or refused to be bullied and stood her ground, she was subjected to increased levels of harassment, hostility, and retaliation. This was also true for men who associated or supported these females.

27. When Plaintiffs questioned Defendant's directives, they were told they were not qualified to question the instruction and proceed as told.

28. In some cases, Plaintiffs were told to engage in processes that were potential legal violations.

29. Many times, Plaintiffs were required to develop their processes to correct or remedy issues.

30. The onboarding process was another one that was disorganized and problematic. Jenkins, together with several team members, rebuilt the onboarding process.

31. For example, when completing the onboarding paperwork, the system allowed candidates working in a U.S. Territory to select that territory rather than choosing the United States. When doing so, their social security numbers would not be populated in the Workday system, making that field appear blank. Plaintiffs were required to "fix" this. The empty field had a trickle effect on other departments, such as the wrong or incomplete SSN going to the vendor doing background checks or the Benefits Department.

32. When a worker's employment was terminated, the Defendant's employee services team was supposed to remove their work email address.

33. If the worker were reemployed, the onboarding email would go to their personal email, where the worker would see it. This was often not done, and the onboarding emails would go to that individual's old work email address, which caused significant onboarding issues.

34. When Jenkins was hired, Defendant put her in a position that had not yet been created. She was to function as a go-between for both Employee Services and Hiring teams. She was given the title of team lead but not the corresponding pay.

35. Defendant told Jenkins to create a job description for the position she was performing and then apply for that position. This was with the understanding she would be hired into that position. Two weeks later, she learned that Jester hired a male to fill the position. When she questioned this decision, Defendant's management, including Jester, became increasingly hostile and began making threats to fire her. This male employee told Jenkins, "Good luck with this place and your boss," and he left within the week.

36. Jenkins brought up these issues with the HR director at headquarters and was told that she would side with Jester no matter what.

37. Jenkins' daily duties as the onboarding lead for Defendant required her to review all job requisitions, job correction requests and report to the team what needed correcting. For example, a recruiter posted a position. The job requisition stated employee's hourly rate was $1,000,000.

38. Defendant had Jenkins written up for reviewing a job requisition, even though it was required by her job duties.

39. Defendant never had a set process for conducting background checks. Defendant's policy was to have a background check started but not completed before a candidate starting work. Remember, Defendant is hiring for positions with the Department of Defense and Homeland Security. In many cases, these workers could be required to carry a firearm.

40. One such candidate was charged with voyeurism for allegedly placing a camera under a woman's desk. Plaintiffs were told to go ahead and hire him, knowing this

information. A couple of weeks later, he was arrested by the FBI for putting cameras under women's desks at CACI.

41. Defendant's management often pushed to onboard a worker without sufficient time to perform a background check.

42. Plaintiffs were told not to perform background checks on the "white gloved" employees.

43. Defendant's I-9 processes were disorganized. Defendant did not know what constituted the third day, the deadline by which completed I-9 information was required. If the documentation is incomplete, the process is not complant with the legal requirements.

44. When Plaintiffs first started with Defendant, the dress code allowed employees to wear jeans. For the employees that made less money, this was a factor in their decision to take employment with Defendant. When Jester took over for Nesteruk, he changed the policy to disallow jeans. Employees began making calls to the ethics hotline, complaining about Jester regarding the policy change. During a Senior Staff Manager meeting, Jester announced that an ethics complaint was made against him regarding the policy change, stating he knew the complaint came from the HR department.

45. When Plaintiffs would bring up an issue or a policy concern, they were told they were not qualified to question. The team was made up of all females except for one male.

46. In early to mid-2018 individuals from all departments began to make ethics hotline complaints against Jester, and he would speak openly about them in the Sr. Staff Meetings.

47. Jester commented in Senior Staff Meetings that his wife was an attorney, and he knew what he could "get away with."

48. These comments were intimidating and were taken as veiled threats.

49. The Payroll Department made many mistakes that caused workers not to be paid correctly or timely. One error resulted in the entire company not being paid on time. Because Jester protected the individual responsible for this mistake, his employment was not terminated. Still, he was moved into a special position created for him, making it appear that he was promoted for this colossal mistake.

50. The Payroll Department made many mistakes that the HR Department, including Plaintiffs, were required to catch, fix, and for which they were often blamed. Solving many of the payroll issues was often a lengthy process that would delay the employee's actual start date. If it was not possible to postpone the employee's start date, the first several weeks of their employment were spent trying to resolve their payroll issues. This happened multiple times a week. Defendant's management provided no direction or assistance. Plaintiffs were just told to find a way to fix the problems created by the payroll issues.

51. Defendant hires many individuals that live and work outside the United States. In the fall of 2019, a payroll issue involving Defendant's overseas workers occurred. Many of these workers listed an address under an Army Post Office, Post Office

Box, or a Postal Service Center. Plaintiffs were asked to request that these employees update their primary addresses by a specific date. If they did not, Plaintiffs were directed to individually update their primary address to be the address of Defendant's corporate headquarters in Virginia. Not only is this deceptive, but it could lead to problematic tax issues for the worker.

52. Plaintiffs expressed their discomfort with using the address of Defendant's corporate headquarters for individual employees in a meeting. If the worker did not have an address in the United States, Plaintiffs were told to use the address of Defendant's corporate headquarters in Virginia. Not only is this deceptive, but it could lead to problematic tax issues for the worker.

53. Plaintiffs were told they are not qualified to question any directive and to proceed as told.

54. One of the departments Shaffer oversaw was the HR Help Desk. The highest volume of calls received by the Help Desk was over payroll issues. During a meeting in the summer of 2019, Shaffer, and Dawn Mogan reported to Jester that John Loudermill, Payroll Manager, had changed or adjusted taxes, causing payment issues. During the discussion with Jester, he became agitated with Mogan, raised his voice, and pointed his finger in her face.

55. Mogan calmly and professionally stood up to Jester's bullying behavior, asking him to remove his finger from her face. A few days later, Jester demand that Shaffer fire Mogan for insubordination. When Shaffer stated that Morgan was a good performer and her request that Jester remove his finger from her face was not

insubordination. Jester again became angry and threatening, standing over Shaffer with his fists clenched. While Shaffer feared for her safety, she remained resolute that it was not proper to fire Mogan.

56. Shaffer contacted her HR business partner, Jena Plews, and informed her of the increasingly hostile work environment she was enduring. Plews told Shaffer to work it out with Jester on her own.

57. All errors were shown to be the fault of the Payroll Department, yet Jester continued to hold the HR department responsible.

58. The issues with the Payroll Department were so severe that the Department of Labor lodged complaints and fines against the Defendant.

59. The derogatory and demeaning actions of management grew and created a hostile work environment for all Plaintiffs.

60. Defendant's local management would engage in threatening behavior when corporate leaders would come to Oklahoma City. One such incident occurred with John Mengucci visited. Local management told Plaintiffs that there would be a question-and-answer session. If any questions about compensation or payroll were asked, that person's name would be put on a list. Threatening, "you do not want to be on that list."

61. The Plaintiffs sought to advance in the company only to see those promotions go to males or individuals that would support maintaining the hostile environment created by management.

62. In the Spring of 2019, when a male complained, Myer was called into a meeting and, together with two other females and reprimanded for "mean girl behavior."

The females were not given any opportunity to understand or resolve the matter. All three women were eventually fired based on an obscure policy while the male retained his employment.

63. As complaints about the unethical, illegal, and hostile work environment continued on the ethics hotline, the Plaintiffs learned that Jester was the individual investigating those complaints.

64. Jester told Shaffer he would terminate her employment if she did not find a way to make the complaints to the ethics hotline stop.

65. Defendant continued to threaten Plaintiffs creating a hostile work environment. In June 2020, Defendant's management team members told Jenkins, Vaughn, Cox, Myer, and Jacobs that they were being terminated for the violation of a policy that did not exist.

66. On the Monday leading up to these terminations, Jenkins, Vaughn, Cox, Myer, and/or Jacobs could not log into their computers.

67. Several were told Jester instructed the IT department that if anyone from HR called about the denied access, to tell them there were network issues, and they were working on it.

68. The Defendant contends that Shaffer was terminated for poor performance in March of 2020. However, she had received performance-based bonuses in May, August, and November 2019. Her team consistently met or exceeded all SLA's. Rob Morris from Corporate told her that the HR department was running above expectations in the SSC, and they were very impressed.

69. None of the Plaintiffs had ever been placed on a Performance Improvement Plan.

## COUNT I:
## Discrimination and Retaliation in Termination of Employment
## (Title VII and OADA)

70. Plaintiffs incorporates and realleges, in full, paragraphs 1 through 39 of this Original Complaint.

71. Plaintiffs held the good faith belief that they were opposing and reporting sex discrimination to management, opposing, or complaining of discrimination made unlawful by Title VII and Oklahoma Anti-Discrimination Act (OADA). Plaintiffs were therefore engaged in activity protected under Section 704(a) of Title VII and OADA.

72. Plaintiffs' complaining of and opposition to sex discrimination were motivating factors in Plaintiffs' terminations. Defendant willfully, knowingly, and intentionally discriminated and retaliated against Plaintiffs on the basis of their opposition to and complaints of sex discrimination and retaliation.

73. Plaintiffs believed by engaging in the aforementioned conduct, Defendant violated, and continues to violate Section 703(a)(1) & 704 (a) of Title VII and OADA, which makes it an unlawful employment practice for an employer to discriminate or retaliate against any person because they opposed or complained of any practice made an unlawful employment practice by Title VII and OADA.

74. Defendant engaged in the conduct alleged under this Count with malice and reckless indifference to the federally protected rights of Plaintiffs such that Plaintiffs is entitled to punitive damages.

75. As a direct and proximate result of the violations of Title VII and OADA alleged under this Count, Plaintiffs has been damaged by the loss of their employment and loss of compensation and benefits, loss of promotions and other pecuniary benefits they would have received as employees had Defendant not terminated Plaintiffs' employment in violation of Title VII and OADA.

76. As a direct and proximate result of the violations of Title VII and OADA alleged under this Count, Plaintiffs has also suffered mental and emotional distress.

77. As a direct and proximate result of the violations of Title VII and OADA alleged under this Count, Plaintiffs have also suffered other pecuniary losses, the type and amounts of which will be established at the trial of this cause.

**COUNT II:**
**Hostile Work Environment**
**(Title VII and OADA)**

78. Plaintiffs incorporates and realleges, in full, paragraphs 1 through 78 of the Original Complaint.

79. Defendant willfully, knowingly, and intentionally discriminated against Plaintiffs on the basis of gender by creating and maintaining a hostile and abusive work environment in which Plaintiffs were subject to was so severe, pervasive, and humiliating that the terms, conditions, and privileges of their employment palpably deteriorated.

80. Defendant otherwise knew or should have known of such hostile work environment and yet failed to take prompt remedial and corrective action. By such conduct and omissions, Defendant violated the rights of Plaintiffs under Section 703(a)(1) of Title VII and OADA, which make it an unlawful employment practice for an employer

to discriminate against any person because of gender. Defendant otherwise knew or should have known of such hostile work environment and yet failed to take prompt remedial and corrective action.

81. Defendant engaged in the conduct alleged with the willful, knowledge and intention of making Plaintiffs' working conditions hostile.

82. Defendant engaged in the conduct alleged herein with malice and reckless indifference to the federally protected rights of Plaintiffs such that Plaintiffs are entitled to punitive damages.

83. As a direct and proximate result of the unlawful hostile and abusive work environment which Plaintiffs were required to endure, Plaintiffs has suffered nonpecuniary losses, including the emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

84. As a direct and proximate cause of the unlawful sexual harassment alleged under this Count, Plaintiffs has suffered pecuniary losses, the type and amount of which will be established at the trial of this cause.

## COUNT III
### Violation of the Fair Labor Standards Act of 1938

85. Plaintiffs reasserts and incorporates by reference paragraphs 1-85 as set forth above as if fully restated herein.

86. At all material times herein, Plaintiffs were covered employees under the Fair Labor Standards Act (FLSA) and were entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201 et. Seq.

87. The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. See 29 U.S.C. §§ 203 and 207(a)(1).

88. During the course of their employment, Plaintiffs regularly worked in excess of forty (40) hours per week performing work that was both integral and indispensable to his job duties as assigned by Defendant.

89. Plaintiffs Jenkins, Vaughn, Cox, Myer, and Jacobs were hired in HR Administration roles as non-exempt employees.

90. Defendant violated the FLSA by failing to pay overtime compensation of one-and-a-half times the regular rate to these non-exempt employees.

91. Shaffer was hired as an HR Administration Senior Manager for SSC, a position that might qualify her as an exempt employee.

92. Pursuant to Section 213 of the FLSA, 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations.

93. However, if Defendant can meet its burden of showing Shaffer was an exempt employee, Defendant engaged in conduct which would cause it to loss this exemption. Defendant's behavior prevented an otherwise exempt employee from receiving their predetermined salary when due on a guaranteed basis. This conduct makes the salary basis not free and clear and is an impermissible reduction in compensation, causing the loss of exempt status.

94. Accordingly, all Plaintiffs must be paid all amounts of overtime pay in accordance with the FLSA.

95. Defendant's failure to accurately pay overtime was willfully perpetrated. Defendant has not acted in good faith nor with reasonable grounds to believe its actions or omissions were not a violation of the FLSA. As a result, thereof, Plaintiffs are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime premium pay described above pursuant to 29 U.S.C. § 216(b).

96. Defendant's willful failure to pay such wages entitles the Plaintiffs to a three-year statute of limitations as provided in 29 U.S.C. § 255(a).

97. As a result of the aforementioned willful violations of the FLSA's overtime provisions, overtime compensation has been unlawfully withheld by Defendant from Plaintiffs for which Defendant is liable pursuant to 29 U.S.C. § 216 (b).

98. Because Defendant acted willfully and knew, or showed reckless disregard of whether, its conduct was prohibited by the FLSA, Plaintiffs is entitled to damages equal to the mandated overtime premium pay within the three (3) years preceding the filing of this Complaint, plus periods of equitable tolling.

99. As a result of Defendant's actions, Plaintiffs has suffered the damages as herein stated. Pursuant to the FLSA, 29 U.S.C. § 216(b), a successful Plaintiffs is entitled to reimbursement of the costs and attorney's fees expended in successfully prosecuting an action for unpaid wages and overtime wages.

## JURY DEMAND

100.  In accordance with Fed.R.Civ.P. 38(b), Plaintiffs demands a jury trial of all of their claims in this action.

## RELIEF SOUGHT

101.  WHEREFORE, Plaintiffs prays for judgment against Defendant as follows:

  a.  A judgment that Defendant have engaged in all of the conduct alleged in this Complaint, and by engaging in such conduct, violated Title VII and Oklahoma common law;

  b.  A judgment against Defendant awarding Plaintiffs an amount equal to the back pay, and front pay including lost commissions, bonuses, and benefits, they would have received from termination through the date of judgment, but for the sex discrimination and retaliation and violation of Oklahoma public policy.

  c.  A judgment against Defendant awarding Plaintiffs compensatory and exemplary damages as redress for Defendant's violation of Title VII and Oklahoma common law.

  d.  A judgment pursuant to section 16(b) of the FLSA finding SB liable for unpaid back wages, and an equal amount of liquidated damages, due to Plaintiffs;

  e.  A judgment against Defendant awarding Plaintiffs an amount equal to the costs of bringing and enforcing this action, including a reasonable attorney fee and costs.

  f.  A judgment awarding Plaintiffs such other legal and equitable relief as may be appropriate, including prejudgment and post judgment interest.

  g.  For an order awarding Plaintiffs pre- and post-judgment interest at the highest rates allowed by law; and

  h.   For an order granting such other and further relief as may be necessary and appropriate.

Respectfully submitted,

 /s/Jacque Pearsall
Jacque Pearsall, OBA #18317
The Pearsall Group LLC
3030 NW Expressway, Suite 200 #477

Oklahoma City, Oklahoma 73112
Office:        405.289.9521
Facsimile:   405.419.3016
Email: Jacque@thepearsallgroup.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on 2nd day of December 2021, I electronically transmitted the attached. document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants; if counsel of record as listed below is not registered on the ECF System, the foregoing document was delivered via US Mail, postage prepaid.

Denelda L. Richardson, OBA # 20103
drichardson@rhodesokla.com
Rhodes, Hieronymus, Jones, Tucker & Gable
P.O. Box 21100 Tulsa, Oklahoma 74121-1100
(918) 582-1173 Office
(918) 592-3390 Facsimile
Attorneys for Defendant

/s/ Jacque Pearsall
Attorney for Plaintiff