## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

CARLEEN JENKINS, CINDY )
SHAFFER, KIMBERLY COX, and )
KARIS MYER, )
                                 )
            Plaintiffs, )
                                 )     Case No. CIV-21-501-F
-vs- )
                                   )
CACI, INC. – FEDERAL, )
                                   )
            Defendant. )

## <u>ORDER</u>

Plaintiffs Carleen Jenkins, Cindy Shaffer (Shaffer), Kimberly Cox, and Karis Myer are former employees of defendant, CACI, Inc. – Federal (CACI).  They allege claims of gender discrimination, hostile work environment based on gender, retaliation, and failure to pay overtime wages, under both federal and state law.  With leave of court, CACI has filed separate motions for summary judgment as to each individual plaintiff's claims.  This order addresses CACI's motion as to the claims by Shaffer.

<u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A genuine dispute of material fact exists "if a rational jury could find in favor of the nonmoving party on the evidence presented."  <u>Fassbender v. Correct Care Sols., LLC</u>, 890 F.3d 875, 882 (10th Cir. 2018).  In deciding CACI's motion, the court "view[s] the evidence in the light most

favorable to, and draw[s] all reasonable inferences in favor of, the nonmoving party." *Id*.

Shaffer's Response Brief

Shaffer's initial response brief to CACI's summary judgment motion was stricken by the court because of various deficiencies. *See*, doc. no. 136. Shaffer was directed to re-file her response correcting the deficiencies by August 30, 2023. *Id*. The court advised that if Shaffer failed to re-file by that date, the court may take action that is just, including dismissal without prejudice of Shaffer's action. *Id*.

Shaffer filed her response brief on August 31, 2023. In its reply brief, CACI asserts that the response brief fails to remedy all the deficiencies specified by the court. As a result, CACI urges the court to exercise its inherent authority to control its docket and dismiss Shaffer's action.

The court initially notes that Shaffer filed three response briefs of record although one is designated as the response, doc. no. 145, and two are designated as a sealed exhibit, doc. nos. 146 and 147. The response briefs at doc. nos. 145 and 146 attaches exhibits that are not sealed or required to be sealed and the response brief at doc. no. 147 attaches exhibits that are to be sealed. The response brief at doc. no. 145 has different spacing than the other two response briefs. As the court was given a courtesy copy of the response brief at doc. no. 145, with all exhibits attached, the court treats the response brief at doc. no. 145 as Shaffer's response brief.

Although Shaffer's response brief was filed late and still contains deficiencies, the court declines to dismiss Shaffer's action. However, all facts which Shaffer disputes without citations to the record, Responses to Defendants Undisputed Material Facts (RDUMF) nos. 15, 17-20, 23, 27, 30-33, 35-37, 40-41, 46-50, 52-56, 60, 62-63, 66-67, 71-72, 74, 81, 84-87, are deemed admitted. *See*, Rule 56(e), Fed. R. Civ. P. ("If a party . . . fails to properly address another party's assertion of fact

as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").  The additional facts cited by Shaffer are disregarded as there is no citation to an exhibit in the record supporting the additional facts.  *See*, Rule 56(e)(1)(4), Fed. R. Civ. P. ("If a party fails to properly support an assertion of fact . . . the court may . . . issue any other appropriate order.").

Factual Background

On June 11, 2018, Shaffer was hired by CACI for the position of Senior Manager, Human Resources (HR) Administration M3, at its Shared Services Center (SSC) in Oklahoma City.  Shaffer's was the senior-most manager in the HR department.[1]  Shaffer oversaw seven departments: Compensation, Benefits, International, Talent Acquisition, Tier 1, New Hire Administration (NHA), and Employee Services.  The first three departments reported to Shaffer directly, and the latter four departments had managers who reported to Shaffer.  In late 2019, she had approximately 65 employees falling under her management authority.

Prior to her employment with CACI, Shaffer had not managed more than three employees.  And she had spent approximately 20 years serving in the role of an HR Business Partner, where she engaged in conducting HR investigations, hiring individuals, and ramping up business groups.

According to CACI's job description for Senior Manager, Shaffer was responsible for directing and overseeing the development and maintenance of HR service delivery activities in the SSC and strategically aligning the HR service delivery with CACI's strategic business goals to ensure superior organizational performance.  She also was responsible for providing hands-on operational insight into HR efficiencies, metrics, and service level agreements.

---

[1] CACI also has a corporate HR department located in Virginia.

Specifically, in her role, Shaffer was responsible for (i) managing the strategic direction of the HR Service Center and providing leadership and supervision to all HR SSC staff; (ii) managing resource planning and budget control for the HR Service Center and reviewing potential new activity for the same; (iii) setting strategic design, integration and delivery of all core HR services and transactions to CACI employees, applicants and contractors; (iv) supporting the integration and implementation of HR technology related to customer service and HR transaction processing; (v) providing guidance regarding the utilization and integration of HR systems and working with the corporate HR and CIS to ensure technologies meet user needs; (vi) controlling and monitoring the administration of all human resource transactional activities and policies; (vii) monitoring customer service metrics for service delivery and transactional processing; (viii) analyzing situations and issues, recognizing strategic implications, and applying both specialized expertise and broader HR knowledge to define problems, priorities and desired outcomes; (ix) providing management oversight to all HR SSC staff to implement and to evaluate programs and plans that result in increased organizational efficiencies; (x) handling all HR inquiries and issues; and (xi) participating in organization-wide re-engineering initiatives and overseeing all HR activities to support re-engineering efforts.

At the time of her hiring, Shaffer was directly supervised by Thomas Nesteruk.  On February 16, 2019, Bryan Jester (Jester) was promoted to Senior Vice President, Operations Management, for the entire SSC, and became Shaffer's direct supervisor.

Jester was tasked with maturing the overall operations of the SSC, establishing standards, optimizing team's performance, including addressing operational concerns that had been identified.  He spent the first several months in

his new role evaluating Shaffer, as well as other senior managers, and resetting expectations for the SSC.

According to Jester, Shaffer was responsible for strategy, strategic planning, operating model, organizational structure, capabilities associated with that structure, all to enable the outcomes for her group.  Jester specifically expected Shaffer to develop strategies for her group.  In 2019, Jester coached Shaffer on developing strategies that would result in the outcomes her group should drive to enable CACI's business.

Jester's practice was to conduct weekly one-on-one meetings with his direct reports, which included Shaffer, and he outlined goals for Shaffer's performance on an evaluation tool, called "Touchpoint."[2]

The first Touchpoint from Jester to Shaffer was the 2019 Q4 Touchpoint (05/01/2019 to 06/03/2019).  Jester provided feedback to Shaffer which included: (1) Shaffer has a "good performing team," has made "a number of improvements in the overall operation of her organization," and is "customer focused and looks for her team to add value to enabling the business;" (2) Shaffer's priorities are to "develop the overall knowledge base associated with Tier 1 functions," and to "[add] additional [Talent Acquisition] responsibilities . . . and align[] the [Talent Acquisition] organization to support the new sector alignment;" (3) Shaffer "leads by example and works to deliver results," and she "understands that in order to be effective she needs to set clear goals and hold her teams accountable;" (4) Shaffer should "shed[] any day to day operational tactical tasks . . . to her staff" and "focus

---

[2] CACI's managers are expected to complete a Touchpoint on a quarterly basis with their direct reports.  The Touchpoint captured information related to an employee's performance during a three-month period.  Employees have the opportunity to include their comments in the Touchpoint, and managers are then expected to document comments.  Managers and employees are also expected to have a Touchpoint meeting to discuss the feedback.

on increasing services, improving overall quality and creating a strong succession plan."  Doc. no. 123-8, ECF pp. 1-2.

In the second Touchpoint, the 2020 Q1 Touchpoint (08/1/2019 – 09/04/2019), Jester provided feedback to Shaffer which included: (1) Shaffer "continues to work with her team and continuously works [to] improve customer service;" (2) Shaffer's "focus for [the] next quarter should be around the analysis of the group['s] operations"—looking "at the overall structure of the group to determine if all resources, in particular managers are aligned and structured for high levels of efficiency;" (3) Shaffer needs to "keep in mind how to drive to outcomes, the specifically defined metrics associated with the activities;" (4) Shaffer's "team needs to focus on a well-defined set of operational services," specifically stating "there is still an amount of undefined service items that are performed on an 'ad hoc' basis;" (5) Shaffer needs to "become familiar with managing operations within the constraints of the set budget;" (6) Shaffer should "bring her [managers] into the process to spread ownership of the items and use the process as a development opportunity;" and (7) Shaffer "leads by example and always is willing to take on any task she would ask her staff to complete," but she needs "take ownership and accountability of items, including budget, process, staffing, and other operational items."  Doc. no. 123-9; ECF pp. 1, 2.  He also addressed the need for direction to be "outcome driven," the need for "the cadence on items [] to move at a quick pace to deliver to the business," and the "need to work with her managers to ensure that they understand the desired outcomes and to let them come up with the path to success."  *Id*. at ECF p. 2.

The third Touchpoint, the 2020 Q2 Touchpoint (11/01/2019 – 12/04/2019), Jester provided feedback to Shaffer which included: (1) Shaffer "performs the basic operations of the SSC HR components consistent with the current structure and operation process;" (2) "[a]n area of focus from last quarter was to develop a strategy

to move from a reactive approach to a more pro-active approach," and "[t[here has not been as much progress in this area as would have been hoped;" (3) "The HR area continues to experience a fair amount of d[y]sfunction, in particular between functional groups;" (4) "[a]lthough working with her teams for a tactical execution, the lack of comprehensive strategy has limited the advances in productivity and customer satisfaction;" (5) "[s]trategy and organizational realignment need to be a focus;" Shaffer "needs to not wait for direction or issues to drive behavior, but be proactive and present her approach to improving delivery and overall performance for her group;" (6) "[t]here has not been identified progress on the important initiatives for advancing the SSC HR organization;" and (7) Shaffer "has some strong leaders and others that need[] substantial development;" Shaffer "needs to focus on delegating to her staff and own the broader issues of service delivery and customer satisfaction."   Another topic of discussion that Jester included in the feedback was "[t]oo much drama and general dissatisfaction in the group."  He noted a "number of hotline complaints and employees that are not aligned with the overall delivery model.  Doc. no. 123-10, ECF pp. 1-2.

Unlike the first and second Touchpoints, Shaffer chose not to complete the employee portion of the third Touchpoint, and she did not discuss with him the Touchpoint feedback given.  Shaffer believed that Jester was retaliating against her for not firing certain employees, including Dawn Mogan (Mogan).  She also believed there was no point in talking to him.  At the time, Shaffer was looking for another job.

Jester testified in deposition that he concluded Shaffer was not successful in developing a strategy, building a strategic plan, creating an operating model, dealing with her organizational structure or the underlying capabilities, to deliver the outcomes for her business.  Jester conducted skip-level interviews with managers who reported to Shaffer and found dissatisfaction about her leadership.  He also

conducted skip-level meetings with mid-level managers from other SSC executive team managers (both female and male) to get a pulse of what was going on within SSC.

Jester ultimately made the decision to terminate Shaffer's employment, and Jeana Plews (Plews), HR Director from CACI's corporate HR department, and Brian Churchey (Churchey), Vice President of Workplace Relations, were consulted by Jester regarding the decision.

Jester prepared an outline in advance of a termination meeting with Shaffer on January 31, 2020.  He discussed the topics outlined during that meeting.  Those topics included topics Jester had mentioned in Shaffer's Touchpoints.

Jester advised Shaffer of the termination of her employment and that she would be paid through March 2, 2020.  In a letter dated that same date, Jester stated that Shaffer's employment "is hereby involuntarily terminated effective March 2, 2020 due to poor performance, despite repeated feedback and coaching . . .  Today will be your last day in the office . . . your benefits will end March 31, 2020."  Doc. no. 123-15.  Shaffer's last day in the office was January 31, 2020.  After the termination meeting, she did not have an access badge, any computer access, or CACI equipment.

Within days of Shaffer's termination, Holly Dailey (Dailey), a female, was hired to replace Shaffer.  Dailey is still employed with CACI.

Shaffer filed her charge of discrimination on December 3, 2020.

At her deposition, Shaffer testified that during her employment, Jester yelled at her, belittled her, and treated her differently from men.  The yelling occurred "several times."  Doc. no. 123-1, ECF p. 27, l. 10.  Shaffer testified that during a meeting between herself, Jester, and Mogan (one of Shaffer's direct reports), discussing a payroll issue involving John Loudermill (Loudermill), a male payroll manager, Jester pointed his finger to Mogan within three inches of her face.  Mogan

calmly asked him to remove his finger from her face.   At their next weekly one-on-one meeting, Jester, while seated at his desk, instructed Shaffer to fire Mogan.   Shaffer, who was seated at a nearby round table, responded, "on what grounds?"   Jester then "jumped up from his computer, hovered over [Shaffer] with clinched fists and said, 'what did you say to me.'"   Doc. no. 123-1, ECF p. 28, ll. 22-23.   According to Shaffer, Jester is 6'3 and she is 5'2.   *Id*., l. 21.

Shortly thereafter, in August 2019, she complained to Plews about the incident with Jester.   She told her, "I'm being harassed" and "I'm being retaliated against" by Jester.   Doc. no. 123-1, ECF p. 46, l. 9.   Plews told Shaffer it was "just probably a miscommunication, misunderstanding" and "just to go back to talk" to Jester, "it should all be fine."   *Id*., at ll. 12-13.   Plews did nothing in response to Shaffer's complaint.

In her deposition, Shaffer also testified that one day Jester sent her an e-mail string that had been sent by one of her employees, Carrie Steiner (Steiner), to CACI's Chief Financial Officer, and Jester told her he did not like being "blindsided" by that information.   He immediately rushed to Shaffer's office and screamed at her.   Shaffer asked Steiner to come to her office.   When Steiner was heading to the office, Jester called her stupid.   After Steiner arrived, they looked at the email and Shaffer saw that Loudermill had instructed Steiner to send the email. Jester, without apologizing, went to Loudermill's office, and they laughed about it.   Shaffer testified that it amazed her (as well as Steiner) that Jester would yell at them for something Loudermill had instructed her to do.   Later, Loudermill told Shaffer he did not get chastised about his instruction to Steiner.   Doc. no. 123-1, ECF p. 31, ll. 7-25; ECF p. 32, ll. 1-22.

Shaffer also testified that, for a few months, her office was between Loudermill and another male manager, and Jester would walk back and forth between the two offices, laughing with them, and ignore her.   In addition, she

testified that, at a senior management meeting, Jester went around the room to ask all the managers a question, but he purposely skipped her.  Doc. no. 123-1, ECF p. 35, ll. 2-16.  Also, she testified that Jester was sometimes a no-show at their weekly one-on-one meetings, without giving her prior notice, but he gave other managers prior notice.  And she testified there were times that Jester would ignore her in the hallway, even if she said, "good morning, Bryan."  *Id*., ECF p. 78, ll. 1-5.  Further, she testified that he told her on multiple occasions to "control [her] team" and not make any hotlines complaints against him.  *Id*., ECF p. 55, ll. 18-19.

Discussion

Shaffer claims that CACI discriminated against her based on her gender, subjected her to a hostile work environment based on her gender, and retaliated against her for engaging in protected activity.  Shaffer originally sought relief under both federal and state law.  However, upon motion by CACI, the court dismissed the state law discrimination, hostile work environment, and retaliation claims, brought pursuant to the Oklahoma Anti-Discrimination Act (OADA), 25 O.S. § 1101, *et seq*., because of Shaffer's failure to timely exhaust her administrative remedies.  *See*, doc. no. 13.  With that ruling, only the federal discrimination, hostile work environment, and retaliation claims, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., remain.  CACI seeks summary judgment on each of the Title VII claims.

In the amended complaint, Shaffer alleged an overtime wage claim under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq*.[3]  CACI additionally seeks summary judgment on that claim.  CACI asserts that Shaffer represented during her

---

[3] In the amended pleading, Shaffer also alleged that she sought relief under the Oklahoma Minimum Wage Act (OMWA), 40 O.S. § 197.1, *et seq*.  However, none of the counts of the amended pleading seeks relief under the OMWA.  Count III only sets forth allegations of a violation of the FLSA.  The court concludes that Shaffer has not pleaded an overtime pay claim under the OMWA.

deposition that she was a salaried employee and was not making or pursuing an FLSA claim.  *See*, doc. no. 123-1, ECF p. 39, ll. 20-25, ECF p. 40, l. 1.  Shaffer's counsel also confirmed during that deposition that Shaffer was not making an FLSA claim.  *Id*., ECF p. 42, ll. 2-6.  Further, the court notes that Shaffer did not submit any arguments addressing CACI's summary judgment motion with respect to the FLSA claim.  Upon review, the court concludes that CACI is entitled to summary judgment on the FLSA claim.

Therefore, the court turns to Shaffer's Title VII claims.

Failure to Timely Exhaust Administrative Remedies

Initially, CACI argues that Shaffer's Title VII claims should be dismissed because she failed to timely exhaust her administrative remedies.  In Oklahoma, a Title VII plaintiff must file a charge of discrimination with the appropriate state agency within 300 days after the alleged unlawful employment practice occurs.  *See*, 42 U.S.C. § 2000e-5(e)(1); Riley v. Tulsa County Juvenile Bureau ex rel. Tulsa County Bd. of Com'rs, 421 Fed. Appx. 781, 783 (10th Cir. 2010) (unpublished decision cited as persuasive pursuant to 10th Cir. R. 32.1(A)).  "The filing is a prerequisite to a civil suit under Title VII."  Boyer v. Cordant Technologies, Inc., 316 F.3d 1137, 1138 (10th Cir. 2003).

Shaffer's termination, CACI asserts, occurred on January 31, 2020, and she filed her charge of discrimination on December 3, 2020, more than 300 days after her termination.  Shaffer counters that her filing was timely because her last day of employment was March 2, 2020, not January 31, 2020.

A Title VII discrimination and retaliation claim accrues on "the date the employee is notified of an adverse employment decision."  Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994).  "Generally, an employee is notified of an adverse employment decision when a particular event or decision is announced by the employer."  Gray v. Phillips Petroleum Co., 858 F.2d 610, 614 (10th Cir. 1988).

11

Although Shaffer's termination was not made effective until March 2, 2020, she was notified of the termination on January 31, 2020, during her termination meeting with Jester and by the termination letter dated that same date.  Because her discrimination and retaliation claims accrued on January 31, 2020, and her charge of discrimination was filed more than 300 days from that date, the court concludes that Shaffer's discrimination and retaliation claims are time-barred.  While the 300-day limitations period is subject to equitable tolling, Shaffer has not proffered any evidence to warrant equitable tolling.  *See*, Al-Ali v. Salt Lake Community College, 269 Fed. Appx. 842, 847 (10th Cir. 2008) (equitable tolling recognized "only if circumstances rise to the level of active deception[.]") (unpublished decision cited as persuasive pursuant to 10th Cir. R. 32.1(A)).

Shaffer's hostile work environment claim necessarily accrued no later than January 31, 2020, the date she was terminated and was no longer in the office.  *See*, Al-Ali, 269 Fed. Appx. at 847 ("Any alleged hostile work environment to which [plaintiff] was subjected would have ended with the termination of his employment.").  Because the charge of discrimination was clearly filed more than 300 days from the date she was terminated and was no longer in the office, and Shaffer has not proffered any evidence to warrant equitable tolling, the court concludes that Shaffer's hostile work environment claim is also time-barred.

Because all of Shaffer's Title VII claims are time-barred for failure to timely exhaust her administrative remedies, the court concludes that CACI is entitled to summary judgment on those claims.  Nevertheless, out of an abundance of caution, the court will address the merits of Shaffer's Title VII claims.

Gender Discrimination

Title VII makes it unlawful for any employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1).  "A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 [] (1973)."  <u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1192 (10th Cir. 2012).  In briefing, Shaffer maintains that her claim is based upon direct evidence of gender discrimination.

Direct Evidence

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  <u>Ford v. Jackson National Life Insurance Company</u>, 45 F.4th 1202, 1213 (10th Cir. 2022) (quotation marks and citation omitted).  "But evidence is direct only if it proves the existence of a fact in issue without inference or presumption."  <i>Id</i>.  "[I]n the employment context, this type of evidence is usually impossible to obtain."  <i>Id</i>.

"Generally, comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs."  <u>Ford</u>, 45 F.4th at 1213 (quotation marks, citation and alteration omitted).  "And discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse action."  <i>Id</i>.

As evidence of direct discrimination, Shaffer relies upon an anonymous hotline complaint relating to Jester and Loudermill.  Doc. no. 144-1, ECF p. 4.  The complaint, dated October 4, 2019, states that Jester and Loudermill have "bullied and degraded the women on staff" and have "insinuated to them that they find their place."  It also states that the "affected staff members are all fearful that if they speak

up about their treatment they will be retaliated against and terminated." *Id.*   Doc. no. 123-7, ECF p. 21, ll. 14-16; ECF p. 22, l. 24; ECF p. 23-1-4.

Although Jester had decisionmaking authority over her, Shaffer has not presented any evidence that Jester acted on his alleged discriminatory beliefs.  There is no connection between the alleged comments/actions referenced in the hotline complaint and Shaffer's termination.  The hotline complaint was filed in early October of 2019 and the termination occurred at the end of January 2020.  There is "no temporal proximity" between the comments/actions and the termination.  *See*, <u>Ford</u>, 45 F.4th at 1214 (comments about a month before termination not sufficient to show temporal proximity).  Nor do the alleged comments/actions "demonstrate on their face" that Jester, in terminating Shaffer, did so based on his animosity toward females.  *Id.* (quotation marks, citation and alterations omitted).  They don't "directly reflect the forbidden animus needed for direct evidence of discrimination."  *Id.* (quotation marks, citation and alteration omitted).

Because Shaffer has not presented direct evidence of discrimination,[4]  the court concludes that it should analyze her gender discrimination claim under the <u>McDonnell Douglas</u> framework.[5]

---

[4] The court notes that neither Shaffer nor any other plaintiff filed the hotline complaint concerning Jester.  In addition, the court notes that the record reflects that Churchey investigated the complaint and found no validity to the allegations that Jester or Loudermill bullied or degraded women.  Doc. no. 123-7, ECF p. 24, l. 25, ECF p. 25, ll. 1-2.  After multiple individuals were interviewed, it was determined that individuals had experienced difficult interactions with both men and women and there was a perception that they were difficult to work with as managers.  *Id.*, ECF p. 25, ll. 13-17; doc. no. 153-1, ECF pp. 91, ll. 19-22-ECF p. 98, ll. 1-8, ECF p. 99, ll. 21-22, ECF p. 104, ll. 14-19.  The investigation of the hotline complaint was closed in January 2020. Id., ECF p. 112, ll. 10-12.

[5] In briefing, Shaffer relies solely on the purported direct evidence of gender discrimination to establish her gender discrimination claim.  She makes no effort to analyze her claim using the <u>McDonnell Douglas</u> framework.  CACI has advocated the use of the framework in analyzing Shaffer's claim.  To determine whether summary judgment on the claim, as requested by CACI, is appropriate, the court proceeds with analysis of the claim under the <u>McDonnell Douglas</u> framework.

McDonnell Douglas Framework

"Under the McDonnell Douglas framework, a plaintiff must first raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing fact situations." Bekkem v. Wilkie, 915 F.3d 1258, 1267 (10th Cir. 2019) (quotation marks and citation omitted). "The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." Id. "If the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." Id.

Generally, a prima facie case requires a plaintiff to show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action occurred under circumstances giving rise to an inference of discrimination. See, Bennett v. Windstream Communications, Inc., 792 F.3d 1261, 1266 (10th Cir. 2015). There is no dispute that Shaffer can show that she is a member of a protected class—female, and she suffered an adverse employment action—termination. The question is whether Shaffer can show that her termination occurred under circumstances giving rise to an inference of discrimination.

Shaffer can establish the third prong of the McDonnell Douglas framework in various ways, such as "[she] was qualified for [her] job . . . and [] the job was not eliminated after [her] discharge," "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," "preferential treatment given to employees outside the protected class," or "more generally, upon the timing or sequence of events leading to [her] termination." Singh v. Cordle, 936 F.3d 1022, 1037 (10th Cir. 2019) (quoting Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1229 (10th Cir. 2000)); Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005).

Shaffer relies upon the alleged comments/actions of Jester referenced in the hotline complaint to support her claim. However, Shaffer fails to establish any nexus between the alleged comments/actions and her termination to give rise to an inference of discrimination. Although not argued by Shaffer, the court notes the record does contain evidence, through her own testimony, sufficient to reasonably show that she was qualified for her position as Senior HR Manager, *see*, doc. no. 123-1, ECF p. 54, ll. 8-15; ECF p. 62, ll. 1-3; p. 71, ll. 11-12; ECF 74, ll. 22-25,[6] and it also contains evidence sufficient to reasonably show that her position was not eliminated, as she was replaced by Dailey. *See*, doc. no. 123-17, ECF p. 1.

The court concludes that CACI has presented a legitimate nondiscriminatory reason for Shaffer's termination—that Shaffer was terminated for poor performance. *See*, doc. no. 123-15. As such, the court turns to the third prong of the McDonnell Douglas framework—whether CACI's proffered reason for Shaffer's termination is pretextual. Upon review, the court finds that Shaffer has failed to raise a genuine issue of material fact that the reason for her termination is pretextual or unworthy of belief.

"A plaintiff may show pretext by demonstrating the 'proffered reason is factually false []' or that 'discrimination was a primary factor in the employer's decision.'" DePaula v. Easter Seals El Mirador, 859 F.3d 957, 970 (10th Cir. 2017) (quoting Tabor v. Hilti, Inc., 703 F.3d 1206, 1218 (10th Cir. 2013)). A plaintiff may accomplish this "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id*. "'In determining whether the proffered reason for a decision was pretextual, [the

---

[6] "The relevant inquiry at the prima facie stage is . . . whether the employee has introduced some evidence that she possesses the objective qualifications necessary to perform the job . . . ." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193 (10th Cir. 2000) (emphasis omitted).

court examines] the facts as they appear *to the person making the decision*[]' and '[does] not look to the plaintiff's subjective evaluation of the situation.'"  *Id*. at 971 (quoting E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir. 2011)) (emphasis in original).  "Instead of asking whether the employer's reasons 'were wise, fair or correct,' the relevant inquiry is whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'"  *Id*. (quoting Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1170 (10th Cir. 2007)). In her papers, Shaffer suggests that Jester's reason for her termination—poor performance—is factually false.  Shaffer asserts that the matters stated by Jester in the third Touchpoint were not discussed with her until the very end of her employment and she testified that they were "BS."  *See*, doc. no. 123-1, ECF p. 74, ll. 22-25.  However, the evidence shows that matters in the third Touchpoint had been mentioned in the second Touchpoint, and that Shaffer made the choice not to discuss or challenge the feedback given by Jester in the third Touchpoint. Regardless of whether Shaffer believed the feedback from Jester was "BS," the court is only "concerned with whether the employer held a good-faith belief" that Shaffer performed unsatisfactorily.  C.R. England, 644 F.3d at 1044.  The court concludes that Shaffer has not put forth any evidence which undermines the sincerity of the feedback given by Jester in the third Touchpoint.

Shaffer additionally maintains that formulating policy/strategy was Jester's job responsibility, and not hers, but even if it were her job responsibility, it made up only a small part of her job.  The evidence, however, demonstrates that while Jester was responsible for strategic planning for the SSC organization overall, Shaffer had responsibility for strategic planning in the HR department.  And Jester specifically expected Shaffer to develop strategy and coached her on it.  Shaffer has failed to show that Jester's conclusion that she failed to develop strategy, build a strategic

plan, create an operating model, or deal with her organization structure, to deliver the outcomes of her business, is unworthy of credence.

Next, Shaffer points out that HR corporate's investigation of the October 2019 hotline complaint regarding Jester was closed shortly before she was terminated, and her third Touchpoint specifically commented that there were "too many hotline complaints." However, the record reflects that Jester was not aware of the October 2019 hotline complaint at the time of Shaffer's termination. And while Jester had instructed Shaffer multiple times to "control" her team because of too many hotline complaints, the complaints that are in the record, *see*, doc. no. 147-3, ECF pp. 26-34, indicate they involved the HR department which Shaffer managed. They did not involve Jester. Further, Shaffer does not dispute that it was Jester's position that hotline complaints "are emblematic of an organization that feels like they don't have a voice with their managers." Doc. no. 123-7, ECF p. 173, ll. 6-7. The court concludes that the evidence concerning the filing of the hotline complaints does not raise a genuine issue of material fact that CACI's proffered reason for Shaffer's termination is pretextual.

Shaffer also asserts that she was not placed on any performance improvement plan prior to her termination. While CACI had a procedure which provided for the issuance of performance improvement plans, *see,* doc. no. 147-4, Shaffer does not proffer any evidence to show that Jester was required by CACI to issue a performance improvement plan before he could terminate her. Further, the evidence indicates that Jester consulted with Plews and Churchey, HR corporate employees, regarding his decision to terminate Shaffer's employment. The court concludes that the lack of a performance improvement plan does not raise a genuine issue of material fact that CACI's proffered reason for termination is pretextual.

In addition, Shaffer contends that her Touchpoints were fine up until the time she refused to fire Mogan. However, the evidence indicates that the meeting

18

involving Mogan occurred in July of 2019, *see*, doc. no. 123-18, ECF p. 2, and both the second and third Touchpoints' feedback occurred after that meeting. Moreover, at the time of the first Touchpoint, Jester had only been Shaffer's direct supervisor for a few months. Further, Shaffer does not dispute that Jester had authority to fire Mogan even if Shaffer refused to fire her. The court concludes that Shaffer has failed to show that CACI's proffered reason for her termination is unworthy of belief based on the evidence involving the Mogan incident.

Further, Shaffer asserts that she had prepared an HR "All Hands" presentation to give on January 24, 2020, and she had emailed the presentation to Jester on January 23, 2020 for his comments. Toward the end of the presentation, under the heading "Challenges," Shaffer stated, in part, that HR SSC was "Blamed for All That Goes Wrong No Matter What Department," that it "Constantly Ha[s] to Research and Defend HR Position/Responsibility;" that it is "Yelled and Cursed at By Employees and Management;" and that corporate "Vocalized Wanting SSC to Fail[.]" Doc. no. 147-7, ECF p. 17. Shortly thereafter, Jester emailed her stating that he wanted to attend the presentation and instructing her to cancel it. He wanted to discuss "the overall intent and messaging." *Id*., ECF p. 2. Eight days later Shaffer was terminated. The presentation was mentioned by Jester in the termination outline as a failure of strategy and communication on Shaffer's part. He stated that there was "no formal and ongoing communication with the team," that he had "been pushing for an all-hands for months," and that the one Shaffer had scheduled "was highly tactical and punitive in nature." Doc. no. 123-14, ECF p. 1. The court concludes that neither Shaffer's statements in the "All Hands" presentation nor the subsequent cancellation of the presentation by Jester raises a genuine issue of material fact that CACI's proffered reason for her termination was factually false.

Lastly, Shaffer points out that she received a three-percent merit pay increase on August 1, 2019, and three bonuses on May 1, 2019, August 1, 2019, and

November 1, 2019, totaling $23,250, all under Jester's supervision. *See*, doc. no. 147-6. However, Shaffer does not proffer any evidence to provide the specifics for the merit pay increase or bonuses, *i.e.*, the criteria upon which they were based and whether the bonuses in August and November took into consideration Shaffer's second or third Touchpoints. The court finds that the merit pay increase and the three bonuses do not raise a genuine issue of a material fact that CACI's proffered reason for firing her on January 31, 2020 for poor performance was false.

As stated, a plaintiff may show pretext by demonstrating that discrimination was a primary factor in the employer's decision. *See*, <u>DePaula</u>, 859 F.3d at 970. The court concludes that Shaffer has failed to proffer any evidence that discrimination was a primary factor in CACI's decision to terminate her.

Viewing the record evidence in Shaffer's favor, the court concludes that the evidence fails to raise a genuine issue of material fact that CACI's proffered reason to terminate Shaffer's employment is pretextual or unworthy of belief. Shaffer's subjective belief and perceptions of her job performance cannot support an inference of pretext. There is nothing in the record, in the court's view, to suggest that the reasons proffered by CACI for Shaffer's termination were not honestly believed or that CACI did not act in good faith upon its beliefs. The court's role is to prevent intentional discriminatory practices, not to act as a super personnel department, second guessing CACI's honestly held business judgment. *See*, <u>DeWitt v. Southwestern Bell Telephone Company</u>, 845 F.3d 1299, 1308 (10th Cir. 2017). Based on the record before it, the court finds that a rational jury could not find CACI's rationale for its termination decision unworthy of credence and hence infer that CACI did not act for the proffered nondiscriminatory reason. As a result, the court finds that CACI is entitled to summary judgment on Shaffer's Title VII gender discrimination claim.

Retaliation

Title VII also makes it unlawful for an employer to retaliate against an employee "because she has opposed any practice made an unlawful employment practice by this subchapter." Khalik, 671 F.3d at 1192 (quotation marks, citation and alteration omitted). "A claim of Title VII retaliation can likewise be proven either by direct evidence or by reliance on the McDonnell Douglas framework." Bekkem, 915 F.3d at 1267. Shaffer does not point to any direct evidence of retaliation to support her claim. The court therefore concludes that it should analyze Shaffer's retaliation claim under the McDonnell Douglas framework.[7]

To state a prima facie case of retaliation, a plaintiff must show (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) there exists a causal connection between the protected activity and the adverse action. See, Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004).

Upon review, the court concludes that Shaffer has failed to proffer evidence sufficient to raise a genuine issue of material fact that there exists a causal connection between the alleged protected activity and the alleged adverse action. To establish a causal connection, Shaffer must show that the individuals who took adverse action against her knew of her protected opposition. Zokari v. Gates, 561 F.3d 1076, 1081 (10th Cir. 2009). "The employer must know not only that the employee has opposed an action of the employer [], but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII (here, [gender] discrimination)." Id. Shaffer testified that she told Plews that Jester was harassing her or retaliating against her. However, there is nothing in Shaffer's testimony to

---

[7] Again, Shaffer makes no effort to analyze her retaliation claim using the McDonnell Douglas framework. CACI has advocated the use of the framework in analyzing the claim. To determine whether the summary judgment on Shaffer's claim, as requested by CACI, is appropriate, the court proceeds with analyzing the retaliation claim under the McDonnell Douglas framework.

show that Shaffer informed Plews that she believed Jester's harassment or retaliation was premised on her gender.  Shaffer has failed to show that her complaint to Plews put her on notice that she was concerned about gender discrimination by Jester.

In her papers, Shaffer also asserts that she complained in certain reports to Jester and in her "All Hands" presentation about concerns she had, and that she was terminated eight days after she emailed the "All Hands" presentation to Jester. However, the reports to Jester and the "All Hands" presentation do not indicate that the alleged mistreatment discussed by Shaffer was due to gender.  Shaffer has failed to show that the reports and the "All Hands" presentation put Jester on notice that she was concerned about gender discrimination.

Because Shaffer has failed to proffer evidence sufficient to raise a genuine issue of material fact as to the causal connection element, the court concludes that Shaffer cannot establish a prima facie case of retaliation.[8]  The court therefore finds that CACI is entitled to summary judgment on Shaffer's Title VII retaliation claim. *See*, Zokari, 561 F.3d at 1082 (affirming summary judgment on retaliation claim for failure to establish a prima facie case of retaliation).[9]

---

[8] Even if Plews was on notice that Shaffer was opposing gender discrimination when she complained to her about Jester's conduct, the court concludes that Shaffer still has not satisfied the causal connection element.  To establish the causal connection, Shaffer may proffer "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Proctor v. United Parcel Service, 502 F.3d 1200, 1208 (10th Cir. 2007).  Shaffer's complaint to Plews, in August 2019, was more than four months before her termination.  Under Tenth Circuit precedent, the proximity of three months between a complaint and adverse action is insufficient to support the causal connection element. *Id*. at 1208.  As such, additional evidence is required from Shaffer. *Id*. at 1209.  However, Shaffer has not attempted to show what that additional evidence would be.  Although evidence of pretext may constitute additional evidence, the court concludes that Shaffer has not demonstrated pretext for the same reasons previously discussed with respect to her gender discrimination claim.

[9] Further, even if the court were to find that Shaffer proffered evidence to raise a genuine issue of material fact as to each of the elements of a prima case of retaliation, including causal connection, based on the alleged concerns she raised to Jester in the "All Hands" presentation, submitted

Hostile Work Environment

In addition, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Delsa Brooke Sanderson v. Wyoming Highway Patrol, 976 F.3d 1164, 1174 (10th Cir. 2020) (quotation marks and citation omitted). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." Throupe v. University of Denver, 988 F.3d 1243, 1251 (10th Cir. 2021) (quotations marks and citation omitted). To establish a hostile work environment claim, the plaintiff must show (1) she was discriminated against because of her sex, and (2) the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment. See, Throupe, 988 F.3d at 1251.

To support her claim, Shaffer relies upon the alleged harassing conduct of Jester. That conduct consisted of (i) belittling and yelling at her several times; (ii) pointing his finger at Mogan within three inches of her face, while discussing a payroll issue involving Loudermill; (iii) instructing Shaffer to fire Mogan and, when she asked on what grounds, jumping up from his computer, hovering over her with clinched fists, and saying, "what did you say to me;" (iv) walking back and forth between Loudermill's office and another male manager's office, and laughing with them, while ignoring Shaffer, even though her office was between the male managers' offices; (v) screaming at Shaffer about an e-mail string that had been sent by Steiner to CACI's Chief Financial Officer, calling Steiner stupid, laughing with

---

shortly before her termination, the court concludes that Shaffer could not establish that CACI's proffered reason to terminate her is pretextual or unworthy of belief for the reasons previously discussed with respect to her gender discrimination claim. Hiatt v. Colorado Seminary, 858 F.3d 1307, 1323 (10th Cir. 2017) (affirming summary judgment on retaliation claim for failure to create triable issue that employer's reasons for any adverse employment actions were pretextual for retaliation).

Loudermill after Shaffer pointed out that he gave the instruction to send the email; and not chastising him about the instruction; (vi) going around the room during a senior management meeting asking all managers a question and skipping her purposely; (vii) cancelling weekly one-on-one meetings with her without prior notice, while giving other managers prior notice; and (viii) ignoring her in the hallway, even when she said, "good morning, Bryan."  Doc. no. 123-1, ECF pp. 27-37.

CACI argues that there is an absence of evidence that the conduct experienced by Shaffer was based on her gender.  In Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79-80 (1998), the Supreme Court held that both opposite-sex and same-sex sexual harassment is actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex."  "The term 'sex' under Title VII refers to class delineated by gender."  Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1263 (10th Cir. 2005) (citation omitted).  Thus, for gender harassment claims, "[if] the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."  Id. (quotation marks and citation omitted).

Viewing the evidence and drawing all reasonable inferences in favor of Shaffer, the court concludes–although the issue is close–that Jester's belittling and yelling at her several times; ignoring her in the hallway; pointing a finger at Mogan within three inches of her face; hovering over Shaffer with his fists clinched; and yelling at Shaffer and calling Steiner stupid over an email Loudermill instructed Steiner to send and then laughing with Loudermill about the instruction rather than chastising him, could be found by a rational jury to have been based on Shaffer's gender or due to gender hostility.

The Tenth Circuit has indicated "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment

claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." O'Shea v. Yellow Technology Services, Inc., 185 F.3d 1093, 1097 (10th Cir. 1999).  Thus, when a plaintiff produces evidence of both gender-based harassment and gender-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view *all* of the allegedly harassing conduct . . . as the product of sex and gender hostility," then "it is for the fact finder to decide whether such an inference should be drawn." *Id.* at 1102, 1097.

The court concludes that the conduct of Jester in purposely skipping over Shaffer in the senior management meeting and being a no-show to weekly one-on-one meetings without giving prior notice to Shaffer constitutes gender-neutral conduct.  The record reflects that women were present at the senior management meeting and were given prior notice when Jester could not make it to weekly one-on-one meetings.  And the court concludes that a rational jury, viewing all the evidence in context, could not reasonably find that this gender-neutral alleged harassing conduct was the product of sex and gender hostility.  The evidence does not support that such treatment was based on Shaffer's gender, that Jester was motivated by general hostility, or that females and not male employees experienced this treatment.  The court is unable to find that this gender-neutral alleged harassing could be considered by a rational jury as a product of sex or gender hostility.

"To prove severity or pervasiveness, a plaintiff must subjectively and objectively perceive the harassment." Ford, 45 F.4th at 1227.  "This means the plaintiff must: (1) subjectively perceive 'the conduct to be severe or pervasive,' and (2) 'show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" *Id.* at 1228 (quoting Throupe, 988 F.3d at 1252).  Severity and pervasiveness are analyzed by looking at the totality of the circumstances and considering "'such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id*. (quoting Morris v. City of Colo. Springs, 666 F.3d 654, 664 (10th Cir. 2012)).  "A few isolated incidents of discriminatory conduct and run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces are insufficient to support a claim for hostile work environment." *Id*. (quotations marks and citations omitted).  Whether the alleged harassing conduct was severe or pervasive is typically a question for the jury, but if the plaintiff fails to make this showing, summary judgment is appropriate. Throupe, 988 F.3d at 1252.

Viewing the evidence and drawing all reasonable inferences in a light most favorable to Shaffer, the court concludes that the alleged harassing conduct of Jester, as testified to by Shaffer, was neither severe nor pervasive.  None of the identified conduct rises to the level of severity required for a hostile work environment claim. *See*, *e.g.*, Morris, 666 F.3d at 667 (describing instances where the Tenth Circuit has found the severity element met, including assault and the physical groping of body parts).  And the court concludes that no reasonable employee would have perceived the described incidents of Jester's gender-based conduct, viewed in the aggregate, as pervasive.

Although the court does not condone pointing a finger within three inches of an employee's face; hovering over an employee with clenched fists, belittling, yelling, or screaming at, or ignoring, an employee, "Title VII does not establish 'a general civility code.'"  Morris, 666 F.3d at 663 (quoting Oncale, 523 U.S. at 81. Here, on the record before the court, viewed in Shaffer's favor, the court concludes that Shaffer has failed to proffer evidence sufficient to raise a genuine issue of material fact that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Id*. at 78.  Thus, the

26

court concludes that CACI is entitled to summary judgment on Shaffer's Title VII hostile work environment claim.

Conclusion

For the reasons stated, CACI, Inc. – Federal's Motion for Summary Judgment as to Claims by Plaintiff Carleen Jenkins (doc. no. 122) is **GRANTED**.

DATED this 23rd day of October, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0501p055.docx