## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

CARLEEN JENKINS, CINDY )
SHAFFER, KIMBERLY COX, and )
KARIS MYER, )
          )
        Plaintiffs, )
          )    Case No. CIV-21-501-F
-vs- )
          )
CACI, INC. – FEDERAL, )
          )
        Defendant. )

## AMENDED ORDER[1]

Plaintiffs Carleen Jenkins, Cindy Shaffer, Kimberly Cox, and Karis Myer (Myer) are former employees of defendant, CACI, Inc. – Federal (CACI). They allege claims of gender discrimination, hostile work environment based on gender, retaliation, and failure to pay overtime wages, under both federal and state law. With leave of court, defendant has filed separate motions for summary judgment as to each individual plaintiff's claims. This order addresses defendant's motion as to the claims by Myer.

Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A genuine dispute of material fact

---

[1] This order corrects an error made in footnote 5 of page 19 of the original order on summary judgment entered at doc. no. 162. That order is **VACATED**. This order replaces the order at doc. no. 162.

exists "if a rational jury could find in favor of the nonmoving party on the evidence presented." Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 882 (10th Cir. 2018). In deciding CACI's motion, the court "view[s] the evidence in the light most favorable to, and draw[s] all reasonable inferences in favor of, the nonmoving party." Id.

Myer's Response Brief

Myer's initial response brief to CACI's summary judgment motion was stricken by the court because of various deficiencies. See, doc. no. 136. Myer was directed to re-file her response brief correcting the deficiencies by August 30, 2023. Id. The court advised that if Myer failed to re-file by that date, the court may take action that is just, including dismissal without prejudice of Myer's action. Id.

In its reply brief, CACI asserts that Myer's response brief was not filed by August 30, 2023. It also asserts that the response brief fails to remedy all the deficiencies specified by the court. As a result, CACI urges the court to exercise its inherent authority to control its docket and dismiss Myer's claims.

The court initially notes that Myer filed two response briefs of record although one is designated as the response, filed August 31, 2023, and one is designated a sealed exhibit, also filed August 31, 2023. See, doc. nos. 143 and 144. Each response attaches a different set of exhibits, exhibits that are not sealed, doc. no. 143, exhibits 1-2 and 5-12, and an exhibit that is sealed, doc. no. 144, exhibit 3. The response briefs at doc. no. 143 and doc. no. 144 are the same document. As the court was given a courtesy copy of the response brief at doc. no. 144, with all exhibits attached, the court treats the response brief at doc. no. 144 as Myer's response brief.

Although Myer's response brief still contains deficiencies, the court declines to dismiss Myer's action. However, all facts which Myer disputes without citations to the record, Responses to Defendants Undisputed Material Facts (RDUMF) nos. 4, 8, 14, 15, 21-26, 38, 44, 47, 52, 54, 56, 58, 61, 65, 67-69, 71, are deemed admitted.

*See*, Rule 56(e), Fed. R. Civ. P. ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").  All facts which Myer disputes with citation to the record but for which the cited material is not in the record or otherwise shown to be admissible, RDUMF nos. 3, 7, 9, 10, 12, 19, and 30, are also deemed admitted.  *Id*.  The additional material facts cited by Myer, doc. no. 143, A-G, are disregarded as they are not supported by a citation to the record.  *See*, Rule 56(e) ("if a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may issue any other appropriate order.").

Factual Background

On July 16, 2018, Myer was employed by CACI to work in the Human Resources (HR) department at its Shared Services Center in Oklahoma City in the position of HR Administration S1.  On April 1, 2019, Myer was promoted to HR Administration S2.  In that position, she was a part of the New Hire Administration (NHA) team providing Tier-2 employee services, supporting new hires, onboarding administration, processes related to background checks, internet background checks, I-9, E-verify, and other related activities.

CACI had an electronic HR information system, called Workday, which was accessible through CACI's internet-based application.  The Workday system contained personal, sensitive, and confidential information relating to CACI employees.  It was used by employees to update their own personal and resume information, benefits enrollment, manage their career, and search for positions within CACI.  It was used by CACI managers for recruiting, personnel transactions, performance management, and reporting.

To perform her job duties, Myer had elevated access to Workday.  Myer was aware she was not to use her elevated Workday access privileges to access employee information for reasons other than legitimate business reasons.

On June 8, 2020, an anonymous hotline complaint was received by CACI stating that (i) Senior HR manager, Holly Dailey (Dailey), had "asked her friend [Tesa Jackson (Jackson)] to apply to another manager position within HR that will be directly under her," (ii) Jackson was "offered sign on bonus," (iii) Jackson was "[n]ot in the position that was being hired for," and (iv) Dailey and Jackson had "[l]ied about knowing each other but they are friends on social networks." Doc. no. 119-7.

On June 17, 2020, Jeana Plews (Plews), HR Director in CACI's corporate HR department, sent an email to Myer's direct supervisor Becky Estes (Estes), advising of receipt of the hotline complaint and that it appeared to be regarding the NHA-Assistant Manager position which was recently filled by Jackson. Plews also spoke with Dailey about it. Dailey was also one of Myer's supervisors.

It appeared to CACI leadership that the information in the hotline complaint would only have been available to an employee within HR with elevated access to Workday. At the request of Bryan Jester (Jester), Senior Vice President of SSC, Estes identified, in an email dated June 17, 2020, seven individuals within the NHA team who played a role in the onboarding process of Jackson. Estes also identified information which would have been appropriate for each of the individuals to access in Workday to perform their job role. One of the seven individuals was Myer. Estes also identified Jackson's recruiter as someone who would have had knowledge of the sign-on bonus, but Estes stated the recruiter's last day was the next day, June 18, 2020.

Jenya Golubeva (Golubeva), CACI's Workday consultant, was asked by CACI to review these seven employees' Workday access.

On June 19, 2020, Jester, Dailey, Estes, and Plews discussed the initial review conducted by Golubeva and determined that there were team members who were reviewing information outside the scope of their work-related duties. That same day,

CACI requested Golubeva to prepare an audit report of the Workday keystroke activity for all ten NHA team members, consisting of nine females and one male. Information was available from Workday for a period of roughly 30 days.

In the morning of June 22, 2020, Golubeva circulated full audit trail reports for the team members, along with a summary of her review of the data contained in the reports.  A summary of the findings for each worker that identified areas of concern was also circulated.  Myer's report showed she accessed confidential information in Workday, relating to co-workers and supervisors.

Myer's access included looking at highly confidential information and sensitive employee information, including review of the compensation of her first and second in line supervisors, Jackson and Estes, and former supervisor, Tiffany Isennock.

Shortly thereafter, CACI met with Myer.  She was questioned concerning inappropriate access to Workday information.  Jester, Estes, Dailey, and Heather Dolezal (Dolezal), Human Resources business partner in CACI's corporate HR department, attended the meeting.

After the meeting, Jester, Dailey, and Estes collectively made the decision to terminate Myer.  Brian Churchey (Churchey), Vice President of Workplace Relations, Dolezal, and Plews participated in those conversations and agreed with the decision to terminate Myer.  All believed that Myer had been accessing personnel information in Workday without a legitimate business purpose.

On June 23, 2020, Estes and Dailey issued a Notice of Termination to Myer, informing that she was terminated for unprofessional behavior in violation of CACI's Standards of Ethics and Business Conduct (Standards).  The Standards prohibit employees from using confidential or proprietary information in an unauthorized manner.  They also require that CACI assets be used for legitimate

business purposes.   CACI considered its personnel files to be confidential information that may only be accessed or used for a legitimate business purpose.

Three other NHA team members were terminated as part of the same investigation—plaintiff Kimberly Cox (female), Sheila Vaughn (female), and Leigh Jacobs (male).  Plaintiff Carleen Jenkins, who was on vacation at the time, resigned her employment prior to her return to work.

The other five female NHA team members whose Workday access had been reviewed by CACI leadership were not interviewed or terminated.  CACI determined that they did not engage in egregious conduct based on the information accessed and their job roles at CACI.

In 2019, Myer had raised concerns to Estes, related to Estes' decision not to promote her from the HR Administration S1 position to the HR Administration S2 position (same duties, different pay scale) because of attendance issues.  After Myer set out the reasons for her attendance issues, Estes moved forward with the promotion.  However, Myer believes this confrontation with Estes led to her termination.  Myer never made a complaint to Jester, Dailey, Estes, Churchey, Plews, or Dolezal that she was being discriminated against or was being subjected to differential treatment because of her gender.

Myers had been hired as an hourly non-exempt employee.  By the end of her employment, she was compensated at the regularly hourly rate of $15.41.  As an hourly non-exempt employee, Myer was eligible for overtime compensation for all hours worked over 40 in a workweek.  Myers was paid for all hours of work recorded, including for all overtime hours recorded.  Myer claims that she worked hours in excess of 40 hours that was not compensated.  Although she does not have the exact number of times this happened, she testified that it occurred at least once. She did not keep track of any of the overtime hours she worked.

<u>Discussion</u>

6

Myer claims CACI discriminated against her based on her gender, subjected her to a hostile work environment based on her gender, and retaliated against her for engaging in protected activity.  The claims are brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and the Oklahoma Anti-Discrimination Act (OADA), 25 O.S. § 1101, *et seq*.  Because "[t]he OADA is analyzed similarly to the Title VII claims," Jones v. Needham, 856 F.3d 1284, 1292 (10th Cir. 2017), the court's analysis of the Title VII claims applies equally to Myer's OADA claims.

In addition to the Title VII and OADA claims, Myer alleges an overtime wage claim under the Fair Labor Standards Act (FLSA) of 1938, 29 U.S.C. § 201, *et seq*.

CACI seeks summary judgment on each of Myer's claims.

Gender Discrimination

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1).  Myer claims she was discharged because of her sex.  "A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 [] (1973)."  Khalik v. United Air Lines, 671 F.3d 1188, 1192 (10th Cir. 2012).  In her papers, Myer maintains that her claim is based upon direct evidence of gender discrimination.

Direct Evidence

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  Ford v. Jackson National Life Insurance Company, 45 F.4th 1202, 1213 (10th Cir. 2022) (quotation marks and citation omitted).  "But evidence is direct only if it proves the existence of a fact in issue

without inference or presumption." *Id*.  "[I]n the employment context, this type of evidence is usually impossible to obtain." *Id*.

"Generally, comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs." Ford, 45 F.4th at 1213 (quotation marks, citation and alteration omitted).  "And discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision." *Id*.  at 1213-14.

As evidence of direct discrimination, Myer relies upon an anonymous hotline complaint relating to Jester and a payroll manager, John Loudermill (Loudermill). Doc. no. 144-1, ECF p. 4.  The complaint, dated October 4, 2019, states that Jester and Loudermill have "bullied and degraded the women on staff" and have "insinuated to them that they 'find their place.'"  It also states that the "affected staff members are all fearful that if they speak up about their treatment they will be retaliated against and terminated." *Id*.

Although Jester had decisionmaking authority over her, Myer has not presented any evidence that he acted on his alleged discriminatory beliefs.  There is no connection between the alleged comments/actions referenced in the complaint and Myer's termination.  As stated, the hotline complaint is dated October 4, 2019, and Myer's termination occurred on June 23, 2020.  There is "no temporal proximity" between the comments/actions and the termination. *See*, Ford, 45 F.4th at 1214 (comments about a month before termination not sufficient to show temporal proximity).  Nor do the alleged comments/actions "demonstrate on their face" that Jester, in terminating Myer, did so based on his animosity toward females. *Id*. at 1213 (quotation marks, citation and alterations omitted).  The alleged comments/actions don't "directly reflect the forbidden animus needed for direct

evidence of discrimination." *Id*. at 1215 (quotation marks, citation and alteration omitted).

Because the court concludes Myer has not adduced direct evidence of discrimination, the court concludes that it should analyze her gender discrimination claim under the McDonnell Douglas framework.[2]

McDonnell Douglas Framework

"Under the McDonnell Douglas framework, a plaintiff must first raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing fact situations." Bekkem v. Wilkie, 915 F.3d 1258, 1267 (10th Cir. 2019) (quotation marks and citation omitted). "The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id*. "If the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id*.

Generally, a prima facie case requires a plaintiff to show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action occurred under circumstances giving rise to an inference of discrimination. *See*, Bennett v. Windstream Communications, Inc., 792 F.3d 1261, 1266 (10th Cir. 2015). There is no dispute that Myer can show that she is a member of a protected class—female, and she suffered an adverse employment action—

_____

[2] In her briefing, Myer relies solely on the purported direct evidence of gender discrimination to establish her gender discrimination claim. She makes no effort to analyze her claim using the McDonnell Douglas framework. CACI has advocated the use of the framework in analyzing Myer's claim. To determine whether summary judgment on the claim, as requested by CACI, is appropriate, the court proceeds with analyzing the claim under the McDonnell Douglas framework.

termination.  Instead, CACI challenges whether Myer can show that her termination occurred under circumstances giving rise to an inference of discrimination.

Myer can establish the third prong of the McDonnell Douglas framework in various ways, such as "[she] was qualified for [her] job . . . and [] the job was not eliminated after [her] discharge," "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," "preferential treatment given to employees outside the protected class," or "more generally, upon the timing or sequence of events leading to [her] termination." Singh v. Cordle, 936 F.3d 1022, 1037 (10th Cir. 2019) (quoting Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1229 (10th Cir. 2000)); Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005).

In her briefing, Myer relies solely on the hotline complaint that accused Jester of bullying and degrading women and insinuating that they should find their place. Myer, however, has failed to establish any nexus between Jester's alleged actions and her termination. Although not argued by Myer, the court notes the record contains evidence sufficient to reasonably infer that she was qualified for the position of HR Administration S2, see, doc. no. 119-29, ECF p. 31, ll. 5-23, and it also contains evidence sufficient to reasonably infer that the HR Administration S2 position was not eliminated.  See, doc. no. 119-14, ECF p. 5.

The court concludes that CACI has proffered a legitimate nondiscriminatory reason for Myer's termination—that she was terminated for unprofessional behavior in violation of CACI's Standards of Ethics and Business Conduct.  See, doc. no. 119-23.  CACI's Standards prohibit employees from using confidential or proprietary information in an unauthorized manner and require that CACI assets be used for legitimate business purposes.  See, doc. no. 119-28, ECF pp. 3-4.  The court therefore turns to the third prong of the McDonnell Douglas framework—whether CACI's proffered reason for Myer's termination is pretextual or unworthy of belief.  Upon

review, the court finds that Myer has failed to raise a genuine issue of material fact that the proffered reason is pretextual or unworthy of belief.

"A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'" DePaula v. Easter Seals El Mirador, 859 F.3d 957, 970 (10th Cir. 2017) (quoting Tabor v. Hilti, Inc., 703 F.3d 1206, 1218 (10th Cir. 2013)). A plaintiff may accomplish this "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id*. "'In determining whether the proffered reason for a decision was pretextual, [the court examines] the facts as they appear *to the person making the decision*,' and '[does] not look to the plaintiff's subjective evaluation of the situation.'" *Id*. at 971 (quoting EEOC v. C.R. Eng., Inc., 644 F.3d 1028, 1044 (10th Cir. 2011)) (emphasis in original). "Instead of asking whether the employer's reasons 'were wise, fair or correct,' the relevant inquiry is whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Id*. (quoting Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1170 (10th Cir. 2007)).

In her briefing, Myer suggests that CACI's reason for her termination is factually false because her use of Workday to access confidential information about CACI employees was for a legitimate business purpose. However, Myer admitted in her discovery responses that she looked at confidential information of CACI employees without a legitimate business purpose. *See*, doc. no. 119-4, Response to Request for Admission No. 13 at ECF p. 3; doc. no. 119-30, Interrogatory Response No. 7 at ECF p. 5. And while she asserts that she had a legitimate business purpose for accessing Jackson's compensation, Myer did so without having been assigned any task or having any job role that would have warranted the review. *See*, doc. no. 119-29; ECF pp. 8-11; 12-15. "[A] challenge of pretext requires [the court] to look

at the facts as they appear to the person making the decision to terminate plaintiff." Kendrick, 220 F.3d at 1231.  Here, the record indicates that CACI leadership determined that Myer accessed the confidential information about CACI employees without a legitimate business purpose.

In her briefing, Myer asserts that other NHA employees accessed co-workers and supervisors' confidential information in Workday and were not terminated by CACI.  A plaintiff may show pretext on a theory of disparate treatment by "evidence that [she] was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness."  Kendrick, at 1232. But Myer has not shown that the other employees who accessed the information were nonprotected employees.  The other five employees, who were investigated but not terminated, were all female.

Myer additionally points out that there were other hotline complaints, filed in August and December of 2019, which CACI leadership concluded contained confidential information that was obtained by someone with elevated access to Workday, but no audit of NHA team members was then conducted by CACI. However, the record reveals, as to the August complaint, that HR corporate recommended no investigation but rather counseling of employees on the responsibility of having access to sensitive data such as salary information, and this was done by CACI leadership.  *See*, doc. no. 144-1, ECF p. 3.  As to two December complaints, no audit was necessary because Estes was already investigating the issue, and she knew the two employees involved in accessing the confidential information, and the two employees were disciplined by issuance of written warnings.  *See*, doc. no. 144-1, ECF p. 24.  After the investigation relating to the June 2020 complaint was performed, HR corporate employees agreed with CACI leadership's decision to terminate Myer.  The court concludes that the fact that the August and December 2019 hotline complaints did not result in an audit of the NHA

team members' Workday access does not raise a genuine issue of material fact that the reason for Myer's termination is unworthy of credence.

In addition, Myer contends that other SSC employees had elevated access to the Workday system, but they were not audited by CACI leadership.  Despite that other SSC employees may have had elevated access to Workday, Myer does not dispute that CACI limited its investigation to the NHA team members because it appeared to them that the knowledge of confidential information regarding Jackson likely originated from the NHA department where her hire had been announced the day before the hotline complaint was filed.  And although Jackson's recruiter would have also had information relating to the sign-on bonus and was not audited, the record indicates that the recruiter's last day of work was on June 18, 2020.  *See*, doc. no. 119-11, ECF p. 2.  There was no need to audit the recruiter, along with the NHA team members.  The court concludes that the failure of the CACI leadership to audit other SSC employees or Jackson's recruiter does not raise a genuine issue of material fact that the reason for her termination is pretextual.[3]

Further, Myer maintains that Golubeva, in conducting the audit of Workday access activity, was only provided criteria by CACI leadership consisting of the NHA team members' names and a date range to search.  Myer asserts that Golubeva did not know what jobs the NHA team members performed and was not qualified to determine what they should or should not have been reviewing in Workday.  But Myer does not dispute that CACI leadership independently reviewed the data that was provided by Golubeva and, from that review, determined that Myer and other

---

[3] In briefing, Myer asserts that the same confidential information in Workday was also available in the SharePoint file.  However, Myer has not demonstrated that anyone other than Estes and the NHA team members had access to that file.  The court concludes that the existence of the SharePoint file does not raise a genuine issue of material fact as to whether the reason for her termination was pretextual.

NHA team members accessed confidential information relating to co-workers and supervisors.

Lastly, Myer asserts that the way the Workday system was set up (in terms of ability to access confidential information) was determined by CACI, and if CACI leadership did not want NHA team members to access the confidential information, including compensation, it could have placed "hard stops" in the system to prevent the NHA employees from accessing such information. *See*, doc. no. 144, ECF p. 6. However, while CACI, at the relevant time, did not have "hard stops" placed in the Workday system to prevent the NHA employees, like Myer, from accessing confidential information, Myer acknowledged that she knew she was not supposed to access confidential information in Workday without a legitimate business purpose.

Upon review of the record, the court concludes that Myer has failed to proffer evidence sufficient to raise a genuine issue of material fact that CACI's proffered legitimate nondiscriminatory reason for its termination decision is pretextual or unworthy of belief for gender discrimination. The court therefore concludes that CACI is entitled to summary judgment on Myer's Title VII and OADA gender discrimination claims. *See*, DePaula, 859 F.3d at 977-978 (affirming summary judgment because plaintiff failed to show that there was a genuine dispute of material fact as to whether the employer's reasons for termination were pretextual or unworthy of belief).

Retaliation

Title VII also makes it unlawful for an employer to retaliate against an employee "because she has opposed any practice made an unlawful employment practice by this subchapter." Khalik, 671 F.3d at 1192 (quotation marks, citation and alteration omitted). "A claim of Title VII retaliation can likewise be proven either by direct evidence or by reliance on the McDonnell Douglas framework."

Bekkem, 915 F.3d at 1267.  Myer does not point to any direct evidence of retaliation to support her claim.  The court therefore concludes that it should analyze Myer's retaliation claim under the McDonnell Douglas framework.[4]

To state a prima facie case of retaliation, a plaintiff must show (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) there exists a causal connection between the protected activity and the adverse action.  *See*, Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004).

Upon review, the court concludes that Myer has failed to proffer evidence sufficient to raise a genuine issue of material fact that there exists a causal connection between the alleged protected activity and the alleged adverse action.  To establish a causal connection, Myer must show that the individuals who took adverse action against her knew of her protected opposition.  Zokari v. Gates, 561 F.3d 1076, 1081 (10th Cir. 2009).  "The employer must know not only that the employee has opposed an action of the employer [], but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII (here, [gender] discrimination)."  *Id*.  Myer does not dispute that she never made any complaints to Jester, Dailey, Estes, Churchey, Plews, or Dolezal that she was discriminated against or was subjected to differential treatment because of her gender and does not dispute that at the time of her termination, they were unaware of any complaints by her to anyone in CACI management or human resources claiming that she was discriminated against because of her gender.  Myer testified that she raised concerns to Estes related to Estes' decision not to promote her from the HR Administration S1 position to the HR Administration S2 because of attendance issues.  *See*, doc. no.

---

[4] Again, Myer makes no effort to analyze her retaliation claim using the McDonnell Douglas framework.  CACI has advocated the use of the framework in analyzing the claim.  To determine whether summary judgment on Myer's claim, as requested by CACI, is appropriate, the court proceeds with analyzing the retaliation claim under the McDonnell Douglas framework.

119-29, ECF p. 31, ll. 13-25; ECF p. 32, ll. 1-25; ECF p. 33, ll.1-4.  Myer believes that confrontation led to her being included with the group that was terminated.  *Id.*, ECF p. 32, ll. 3-5.  However, there is nothing in Myer's testimony or any other supporting evidence to show that Myer informed Estes that she believed the actions were based on her protected status.  Myer has failed to show that her complaint to Estes put her on notice that she was concerned about gender discrimination.

Because Myer has failed to proffer evidence sufficient to raise a genuine issue of material fact as to the causal connection element, the court concludes that Myer cannot establish a prima facie case of retaliation.  The court therefore finds that CACI is entitled to summary judgment on Myer's Title VII and OADA retaliation claims.  *See*, Zokari, 561 F.3d at 1082 (affirming summary judgment on retaliation claim for failure to establish a prima facie case of retaliation).[5]

Hostile Work Environment

In addition, "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Delsa Brooke Sanderson v. Wyoming Highway Patrol, 976 F.3d 1164, 1174 (10th Cir. 2020) (quotation marks and citation omitted).  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice."  Throupe v. University of Denver, 988 F.3d 1243, 1251 (10th Cir. 2021) (quotations marks and citation omitted).  To establish a hostile work environment claim, the plaintiff must show (1) she was discriminated against

---

[5] Even if Myer presented evidence sufficient to raise a genuine issue of material fact as to each of the elements of a prima case of retaliation, including causal connection, the court concludes that Myer could not establish that CACI's reason to terminate her is pretextual or unworthy of belief for the reasons previously discussed with respect to her gender discrimination claim.  Hiatt v. Colorado Seminary, 858 F.3d 1307, 1323 (10th Cir. 2017) (affirming summary judgment on retaliation claim for failure to create triable issue that employer's reasons for any adverse employment actions were pretextual for retaliation).

because of her sex, and (2) the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment.  Throupe, 988 F.3d at 1251.

To support her claim, Myer testified that (i) she was under-used; (ii) NHA team members would get in trouble if they messed up; (iii) she did not receive training or support in her role; (iv) she was pressured to get work done; (v) Estes informed her that she was not going to promote her because of attendance issues; (vi) Estes told her to "just get it done" when there was an issue about changing addresses for overseas employees and Myer questioned the process; and (vii) former supervisor, Tiffany Isennock, counseled Myer to "stop this mean girl behavior" without explaining what Myer had done.  See, doc. no. 119-29, ECF p. 21, ll. 1-20; ECF p. 28, ll. 22-25; ECF p. 37, ll. 1-12.

CACI argues that there is an absence of evidence that the conduct experienced by Myer was based on her gender.  In Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79-80 (1998), the Supreme Court held that both opposite-sex and same-sex sexual harassment is actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex."  "The term 'sex' under Title VII refers to class delineated by gender."  Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1263 (10th Cir. 2005) (citation omitted).  Thus, even for same-sex sexual harassment claims, "[if] the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."  Id. (quotation marks and citation omitted).

The Supreme Court in Oncale established three ways a plaintiff can establish same-sex harassment:  (1) if the harasser was homosexual and motivated by sexual desire; (2) if the harassment was motivated by a general hostility to the presence of a particular gender in the workplace; and (3) if the harasser treated men and women differently in the workplace.  Oncale, 523 U.S. at 80-81.  Myer has failed to produce

evidence sufficient to establish any of three ways with respect to the alleged harassing conduct of Estes or Isennock. The court concludes that Myer has failed to raise a genuine dispute of material fact that she was discriminated against because of her sex.

"To prove severity or pervasiveness, a plaintiff must subjectively and objectively perceive the harassment." Ford, 45 F.4th at 1227. "This means the plaintiff must: (1) subjectively perceive 'the conduct to be severe or pervasive,' and (2) 'show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" Id. (quoting Throupe, 988 F.3d at 1252). Severity and pervasiveness are analyzed by looking at the totality of the circumstances and considering "'such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Morris v. City of Colo. Springs, 666 F.3d 654, 664 (10th Cir. 2012)). "A few isolated incidents of discriminatory conduct and run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces are insufficient to support a claim for hostile work environment." Id. (quotations marks and citations omitted). Whether the alleged harassing conduct was severe or pervasive is typically a question for the jury, but if the plaintiff fails to make this showing, summary judgment is appropriate. See, Throupe, 988 F.3d at 1252.

Viewing the evidence and drawing all reasonable inferences in a light most favorable to Myer, the court concludes that the alleged harassing conduct of Estes and Isennock was neither severe nor pervasive. None of the identified conduct rises to the level of severity required for a hostile work environment claim. See, e.g., Morris, 666 F.3d at 667 (describing instances where the Tenth Circuit has found the severity element met, including assault and the physical groping of body parts). And

the court concludes that no reasonable employee would have perceived Estes and Isennock's conduct, viewed in the aggregate, as pervasive.

As stated by the Tenth Circuit, "Title VII does not establish 'a general civility code.'" Morris, 666 F.3d at 663 (quoting Oncale, 523 U.S. at 81. Here, on the record before the court, viewed in Myer's favor, the court concludes that Myer has failed to proffer evidence sufficient to raise a genuine issue of material fact that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Id. at 78. Thus, the court concludes that CACI is entitled to summary judgment on Myer's hostile work environment claim.

Overtime Pay[6]

The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which [she] is employed."   29 U.S.C. § 207(a)(1).   "To succeed on an FLSA claim for unpaid overtime, the plaintiff has the burden of proving that [she] performed work for which [she] was not properly compensated." Brown v. ScriptPro, LLC, 700 F.3d 1222, 1230 (10th Cir. 2012). Myer has the burden to produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id.   At summary judgment, Myer must set forth specific facts showing that there is a genuine issue for trial." Id.

_____

[6] In the amended complaint, Myer asserts that she seeks relief under the Oklahoma Minimum Wage Act (OMWA), 40 O.S. § 197.1, et seq.   However, none of the counts of the amended pleading seeks relief under the OMWA.   Count III only sets forth allegations of a violation of the FLSA.   The court concludes that Myer is not pursuing an overtime pay claim under the OMWA.

Upon review, the court finds that Myer has failed to proffer testimony and supporting evidence adequate to show the amount of overtime worked by a just and reasonable inference. Myer testified that she did not keep track of the overtime hours she worked. Doc. no. 119-29, ECF p. 45, ll. 17-21. The only evidence is her testimony. And Myer testified that she did not know the exact number of times that she worked overtime, but said it occurred at least once. *Id*., ll. 22-25. But she provides no specifics as to her claim. The court concludes that the evidence in the record is insufficient to allow the court (or a rational jury) to reasonably infer the amount or the extent of hours Myer worked in excess of 40 hours in a workweek without proper compensation from CACI.

The court finds that Myer has failed to set forth specific facts showing that there is a genuine issue of material fact for trial with respect to her FLSA claim. Consequently, the court concludes that CACI is entitled to summary judgment on Myer's FLSA overtime pay claim.

Discovery

In her papers, Myer complains that she has been unable to state her case more forcibly due to CACI's unilateral constraints on discovery. Specifically, Myer asserts that she requested Skype messages, which CACI denied having, although examples of Skype messages exist in the summary judgment record. Additionally, Myer asserts that she received limited emails from CACI, because of its filtered keyword search, and the emails she did receive did not contain the entire email strings. Myer believes the missing emails would have supported her claims.

To the extent that Myer believed she did not have an opportunity to discover necessary evidence to support her claims, Rule 56(d), Fed. R. Civ. P., provided her a remedy. Rule 56(d) authorizes the court to (1) defer considering a motion for summary judgment or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order, "[i]f a nonmovant shows

by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."   However, Myer has never invoked Rule 56(d).   And neither she nor her counsel has submitted any affidavit or declaration in compliance with Rule 56(d).   Thus, the court finds no justification for granting Myer any relief under Rule 56(d), including deferral or denial of CACI's summary judgment motion because of the referenced discovery issue.

<u>Conclusion</u>

For the reasons stated, CACI, Inc. – Federal's Motion for Summary Judgment as to Claims by Plaintiff Karis Myer (doc. no. 117) is **GRANTED**.

DATED this 23rd day of October, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0501p053.rev.docx